**TOSTRUD LAW GROUP, P.C.**
JON A. TOSTRUD (CA Bar No. 199502)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel: (310) 278-2600
Fax: (310) 278-2640
Email: jtostrud@tostrudlaw.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE HOLLIN, Derivatively on Behalf of Nominal Defendant MATCH GROUP, INC., | Case No. 24-cv-10776 |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| BERNARD KIM, THOMAS J. MCINERNEY, ALAN G. SPOON, ANN MCDANIEL, GLENN H. SCHIFFMAN, LAURA JONES, MELISSA BRENNER, PAMELA S. SEYMON, SHARMISTHA DUBEY, SPENCER RASCOFF, STEPHEN BAILEY, WENDI MURDOCH, and GARY SWIDLER, | |
| Defendants, | |
| and | |
| MATCH GROUP, INC., | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Lawrence Hollin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Match Group, Inc. ("Match Group" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Match Group, legal filings, news reports, securities analysts' reports about the Company, the pleadings in the consolidated securities class action *Meslage v. Match Group, Inc., et al.,* Case No. 2:24-cv-10153-MEMF-PVC (C.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought by Plaintiff on behalf of Match Group against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least May 2,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2023 and November 6, 2024, inclusive (the "Relevant Period"), and violations of the federal securities laws, as set forth below.

2.    Match Group owns several brands in the online dating and social networking industry, including Tinder, Match.com, OkCupid, and Hinge. The Company primarily earns revenue through subscription services, advertising, and in-app purchases.

3.    In the Company's SEC filings and other public disclosures, Match Group highlights its monthly active users ("MAU") as a key indicator of growth for each of the Company's platforms. MAU and average revenue per user are the Company's primary operating metrics for evaluating the performance of a particular platform.

4.    Throughout the Relevant Period, the Individual Defendants understated the Company's challenges regarding declining MAU for its Tinder platform.

5.    On November 6, 2024, the truth emerged when the Company disclosed, *inter alia*, that "Tinder MAU was down 9% Y/Y in Q3, which was the same rate of decline as in Q2, falling short of our expectations for continued improvement in Y/Y trends."

6.    The following day, Investopedia published an article which reported that, in the third quarter of 2024, Tinder's "monthly active users (MAUs) declined

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

9% from the same time last year and its revenue per payer (RPP) grew less than expected."

7.    On this news, the price of Match Group stock declined 17.8% in one day, from a close of $37.88 per share on November 6, 2024 to a close of $31.11 on November 7, 2024.

8.    As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

9.    Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

11.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

13.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.    This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and is headquartered in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business

in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## **PARTIES**

### *Plaintiff*

16.     Plaintiff is, and has been at all relevant times, a shareholder of Match Group.

### *Nominal Defendant*

17.     Nominal Defendant Match Group is incorporated under the laws of Delaware with its principal executive offices located at 8750 North Central Expressway, Suite 1400, Dallas, Texas, 75231. Match Group's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "MTCH."

### *Individual Defendants*

18.     Defendant Bernard Kim ("Kim") has served as the Company's Chief Executive Officer ("CEO") and as a member of the Board since May 2022. According to the Company's public filings, Defendant Kim received $16,080,272 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Kim beneficially owned 119,564 shares of Match Group common stock, worth

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

$3,821,265.[1] Defendant Kim is named as a defendant in the Securities Class Action.

19.     Defendant Thomas J. McInerney ("McInerney") has served as a member of the Board since November 2015 and as its Chairman since June 2021. According to the Company's public filings, Defendant McInerney received $389,973 in 2023 in compensation from the Company. As of April 22, 2024, Defendant McInerney beneficially owned 337,954 shares of Match Group common stock, worth $10,801,009.

20.     Defendant Alan G. Spoon ("Spoon") has served as a member of the Board since November 2015 and serves as Chair of the Audit Committee. According to the Company's public filings, Defendant Spoon received $334,973 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Spoon beneficially owned 292,226 shares of Match Group common stock, worth $9,339,542.

21.     Defendant Ann L. McDaniel ("McDaniel") has served as a member of the Board since December 2015. According to the Company's public filings, Defendant McDaniel received $329,973 in 2023 in compensation from the Company. As of April 22, 2024, Defendant McDaniel beneficially owned 13,101 shares of Match Group common stock, worth $418,707.

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $31.96 per share closing price of Match Group stock on April 22, 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

22.     Defendant Glenn H. Schiffman ("Schiffman") has served as a member of the Board since September 2016 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Schiffman received $299,973 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Schiffman beneficially owned 267,117 shares of Match Group common stock, worth $8,537,059.

23.     Defendant Laura Jones ("Jones") has served as a member of the Board since March 2024.

24.     Defendant Melissa Brenner ("Brenner") has served as a member of the Board since June 2020. According to the Company's public filings, Defendant Brenner received $304,973 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Brenner beneficially owned 7,111 shares of Match Group common stock, worth $227,267.

25.     Defendant Pamela S. Seymon ("Seymon") has served as a member of the Board since November 2015. According to the Company's public filings, Defendant Seymon received $304,973 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Seymon beneficially owned 76,083 shares of Match Group common stock, worth $2,431,612.

26.     Defendant Sharmistha Dubey ("Dubey") has served as a member of the Board since September 2019. According to the Company's public filings,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendant Dubey received $299,973 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Dubey beneficially owned 390,264 shares of Match Group common stock, worth $12,472,837.

27.     Defendant Spencer Rascoff ("Rascoff") has served as a member of the Board since March 2024.

28.     Defendant Stephen Bailey ("Bailey") has served as a member of the Board since June 2020 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Bailey received $309,973 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Bailey beneficially owned 7,111 shares of Match Group common stock, worth $227,267.

29.     Defendant Wendi Murdoch ("Murdoch") served as a member of the Board from June 2020 until June 2024. According to the Company's public filings, Defendant Murdoch received $319,973 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Murdoch beneficially owned 6,611 shares of Match Group common stock, worth $211,287.

***Officer Defendant***

30.     Defendant Gary Swidler ("Swidler") has served as the Company's President since January 2023 and as its Chief Financial Officer ("CFO") since September 2015. Prior to that, President, Defendant Swidler served as the Company's Chief Operating Officer ("COO") from March 2020 until January 2023.

According to the Company's public filings, Defendant Swidler received $12,993,695 in 2023 in compensation from the Company. As of April 22, 2024, Defendant Swidler beneficially owned 469,441 shares of Match Group common stock, worth $15,003,334. Defendant Swidler is named as a defendant in the Securities Class Action.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of Match Group, and because of their ability to control the business and corporate affairs of Match Group, the Individual Defendants owed Match Group and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Match Group in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Match Group and its shareholders so as to benefit all shareholders equally.

32.     Each director and officer of the Company owes to Match Group and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Match Group, were able to and did, directly

and/or indirectly, exercise control over the wrongful acts complained of herein.

34.    To discharge their duties, the officers and directors of Match Group were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

35.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Match Group, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that Match Group implemented and properly monitored the Company's internal controls; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

37.     To discharge their duties, the officers and directors of Match Group were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Match Group were required to, among other things:

> (a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Match Group's own Code of Business Conduct and Ethics (the "Code of Conduct");
>
> (b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Match Group conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Match Group and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that Match Group's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company

13
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

38.    Each of the Individual Defendants further owed to Match Group and the shareholders the duty of loyalty requiring that each favor Match Group's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

39.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Match Group and were at all times acting within the course and scope of such agency.

40.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Match Group.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.    In committing the wrongful acts alleged herein, the Individual

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

43.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

44.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Match Group, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.    Each of the Individual Defendants aided and abetted and rendered

substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

46.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Match Group and at all times acted within the course and scope of such agency.

## **MATCH GROUP'S CODE OF CONDUCT**

47.    Match Group's Code of Conduct begins with a commitment to "conduct [] business affairs in accordance with not only the requirements of applicable law, but  also standards of ethical conduct that will maintain and foster the Company's reputation for honest and straightforward business dealings."

48.    The Code of Conduct applies to "all Match Group directors, officers and employees, as well as to directors, officers and employees of each subsidiary of Match Group," and violations of the Code of Conduct "may result in serious sanctions by the Company, which may include dismissal, suspension without pay, loss of pay or bonus, loss of benefits, demotion or other sanctions."

49.    In a section titled "**Honest, Lawful, and Ethical Conduct,**" the Code

of Conduct states, in pertinent part, that "[t]he conduct of Covered Persons in performing their duties on behalf of the Company must in all situations, as to all matters and at all times, be honest, lawful and in accordance with high ethical and professional standards."

50.    In a section titled "**Compliance with Laws, Rules, and Regulations**," the Code of Conduct states, in pertinent part, that:

> Complying with the law is the foundation on which Match Group's ethical standards are built. It is Match Group's policy to be a good "corporate citizen". All Covered Persons must comply with applicable governmental laws, rules and regulations. Reasons such as "everyone does it" are unacceptable excuses for violating this requirement of this Code.

51.    In a section titled, "**Disclosure, Financial Reporting, and Accounting**," the Code of Conduct states, in pertinent part:

> The Company is committed to providing full, fair, accurate, timely and understandable disclosure in all reports and documents filed with or submitted to the Securities and Exchange Commission ("SEC") and in all other public communications made by the Company. All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls.

> * * *

> Any Covered Person who learns of any information concerning: (i) significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data accurately, or

(ii) any fraud, whether or not material, involving management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls, shall bring the matter promptly to the attention of a member of the Disclosure Committee.

Upon receipt of any such information, the Disclosure Committee shall investigate the matter, consult with senior management as warranted, confer with the Audit Committee of Match Group's Board of Directors if appropriate, and ensure that any necessary corrective action is taken.

### **MATCH GROUP'S AUDIT COMMITTEE CHARTER**

52.     Pursuant to Match Group's Audit Committee Charter, the purpose of the Audit Committee is to assist the Board in its oversight of:

(i) the integrity of the financial statements of the Company, (2) the effectiveness of the Company's internal control over financial reporting, (3) the qualifications, performance and independence of the independent registered public accounting firm (the "independent accounting firm"), (4) the performance of the Company's internal audit function, (5) the Company's risk assessment and risk management policies as they relate to financial and other risk exposures, and (6) the Company's compliance with legal and regulatory requirements.

53.     In    a    section    titled    "**COMMITTEE AUTHORITY AND RESPONSIBILITIES,**" the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

1.    Review and discuss with management and the independent accounting firm the annual audited financial statements, as well as disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2.    Review and discuss with management and the independent accounting firm the Company's earnings press releases and the results

18
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of the independent accounting firm's review of the quarterly financial statements.

3. Discuss with management and the independent accounting firm significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles.

4. Review and discuss with management and the independent accounting firm any major issues as to the adequacy of the Company's internal controls, including any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls, any special steps adopted in light of these issues and the adequacy of disclosures about changes in internal control over financial reporting.

* * *

6. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies.

54.    With respect to legal and ethical compliance, the Audit Committee Charter states that the Audit Committee shall "[d]iscuss with management, the Company's senior internal auditing executive and the independent accounting firm the Company's and its subsidiaries' compliance with applicable legal requirements and codes of conduct" and "[d]iscuss with the Company's Chief Legal Officer or General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies."

## **SUBSTANTIVE ALLEGATIONS**

*Background*

55.    Match Group owns several brands in the online dating and social networking industry, including Tinder, Match.com, OkCupid, and Hinge. The Company primarily earns revenue through subscription services, advertising, and in-app purchases.

56.    In the Company's SEC filings and other public disclosures, Match Group highlights MAU as a key indicator of growth for each of the Company's platforms. MAU and average revenue per user are the Company's primary operating metrics for evaluating the performance of a particular platform.

57.    Throughout the Relevant Period, the Individual Defendants understated the Company's challenges regarding declining MAU for its Tinder platform.

*False and Misleading Statements*

58.    On May 2, 2023, Match Group published a shareholder letter, which stated the following with respect to Tinder's user growth, in relevant part

> While Tinder is an iconic brand used by many, our data shows that approximately 40% of eligible singles age 18 to 34 in North America and Europe are still not using Tinder, and an additional approximately 35% have used Tinder previously, but not in the last year ("lapsed users"). This provides amply opportunity for Tinder to bring both singles who have never tried the app and lapsed users into the fold. ***Tinder has a strong history of reactivating lapsed users, and the large pool of lapsed users provides significant opportunity to increase reactivations. The way for Tinder to attract new and lapsed users is to deliver exciting features and a product experience that resonates.***

*We're confident that as Tinder does so, it can both return to stronger new user growth and reactivate the large population of lapsed users, which will ultimately drive revenue growth*.[2]

59.     On February 23, 2024, Match Group filed its 2023 annual report on Form 10-K with the SEC (the "2023 10-K"), signed by Defendants Swidler, Kim, McInerney, Bailey, Brenner, Dubey, McDaniel, Murdoch, Schiffman, Seymon, Spoon. The 2023 10-K included the following generic risk disclosure:

*If we fail to retain existing users or add new users, our revenue, financial results, and business may be significantly harmed.*

*Our financial performance has been and will continue to be significantly determined by our success in adding and retaining users of our services.* In the past we have experienced, and expect to continue to experience, fluctuations in the size of our user base in one or more markets from time to time, particularly in markets where we have achieved higher penetration rates. The size of our user base is also impacted by a number of other factors, including competitive products and services and global and regional business, macroeconomic, and geopolitical conditions. For example, wars in the Middle East and Ukraine have led to reduced supply as well as the decision to suspend our services in Russia.

*Further, if people do not perceive our services to be useful, we may not be able to attract or retain users.* In recent years, some users, particularly younger generations, have shown a decreased appetite for our services and those of our competitors due potentially to a number of factors. *With each new generation of users, expectations of our services change and user behaviors and priorities shift.* As a result, we may need to further leverage our existing capabilities or advances in technologies like artificial intelligence ("AI"), or adopt new technologies, to improve our existing services or introduce new services in order to better satisfy existing users and to expand our

---

[2] Unless indicated otherwise, all emphasis is added.

penetration of what continues to be a large available new user market. However, there can be no assurances that further implementation of technologies like AI will enhance our services or be beneficial to our business and the introduction of new features or services to our existing services may have unintended consequences on our ecosystem, which could lead to fluctuations in the size of our user base. Additionally, in 2023 we began consolidating some of our legacy brands' platforms in order to decrease operating costs, which may result in changes to the user experience for some of our brands that some existing users may perceive negatively.

If we are unable to maintain or increase the size of our user base, our revenue and other financial results may be adversely affected. Further, as the size of our user base fluctuates in one or more markets from time to time, we may become increasingly dependent on our ability to maintain or increase levels of monetization in order to grow revenue. Any significant decrease in user retention or growth could render our services less attractive to users, which is likely to have a material and adverse impact on our business, financial condition, and results of operations.

60.    This risk disclosure identified above was materially misleading because it represented as merely hypothetical a risk that had already materialized at the time of the issuance of the statement. Specifically, the Company was already "fail[ing] to . . . add new users" which was already causing "significant[] harm" to its revenue and overall financial results.

61.    On April 29, 2024, Match Group filed a proxy statement on Form DEF 14A with the SEC (the "2024 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Murdoch, Rascoff, Schiffman, and Seymon to serve for another three-year term on the Company's Board and the compensation of certain of the Company's executive officers including Defendants Kim and Swidler.

62.    The 2024 Proxy highlighted Company initiatives to "better drive sustainable long-term user and revenue growth" while failing to disclose the challenges facing the Company regarding Tinder's user growth:

> In 2023, we focused on product innovation to help to better drive sustainable long-term user and revenue growth. At the same time, we implemented initiatives to deliver revenue acceleration throughout the year and continued to drive high levels of profitability and cash flow. We delivered solid financial results during 2023 while focusing on the foundation-building necessary to accelerate our strategic execution in 2024. We grew total revenue 6% to $3.4 billion in 2023. Tinder® Direct Revenue grew 7% year-over-year, driven by growth in revenue per payer ("RPP") due to pricing optimizations in the U.S. market and new weekly subscription offerings, partially offset by a decrease in Payers partially attributed to the pricing optimizations.

63.    With respect to the Company's internal controls, the 2024 Proxy stated that the Audit Committee's responsibilities included "monitoring the integrity of Match Group's financial statements" and "the effectiveness of Match Group's internal control over financial reporting."

64.    With respect to the Company's risk oversight and risk management functions, the 2024 Proxy stated the following:

> The Board's role in risk oversight of the Company is consistent with Match Group's leadership structure, with the Chief Executive Officer and other members of senior management having responsibility for assessing and managing the Company's risk exposure, and the Board and its committees providing oversight in connection with these efforts. Match Group management, including our Senior Vice President, Internal Audit, and our Risk, Controls and Compliance team, is responsible for assessing and managing Match Group's exposure to various risks on a day-to-day basis, which responsibilities include the conduct of an enterprise risk assessment of short-term, long-term and emerging risks, testing of key controls and procedures, and creation of appropriate risk management programs and policies. Management has

developed and implemented guidelines and policies to identify, assess and manage significant risks facing the Company.

65.     These statements were materially false and misleading because despite the 2024 Proxy's descriptions of the Board's and its committees' oversight responsibilities with respect to risk management and internal controls over financial reporting, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements.

66.     On May 8, 2024, Match Group filed a quarterly report for its first fiscal quarter of 2024 (the "1Q24 10-Q") which incorporated by reference the risk disclosure identified above in the Company's 2023 10-K.

67.     During the related earnings call, hosted by the Company on the same day, Defendant Kim understated the Company's challenges regarding generating user growth on Tinder:

> Tinder's international scale and reach has never been matched by any other dating app. And it's critical that we keep the ecosystem vibrant. ***For example, Tinder took decisive action by changing its community guidelines and moderation practices mid-last year, which better enabled the removal of users who are not on the app for its intended purposes. While the improvements to the ecosystem and benefits to the brand are undeniable, these actions did contribute to some of Tinder's MAU declines over the past nine months.***
>
> We believe that actions like these are in the best interest of Tinder's long-term success. ***So we are willing to accept fewer MAU in the short-term*** to create a safer ecosystem and better outcomes for our daters. Diving a little deeper into Tinder, we have heard loud and clear that

some users, especially the Gen Z cohort, are looking for more from their dating apps. We have been in this business a long time, and we have consistently adapted our offerings to best serve the needs of different generations and we understand and recognize that expectations of apps are changing.

***Tinder is working tirelessly to execute against their strategy, and I'm incredibly confident in the team's ability to satisfy these evolving expectations that users have. By the end of the year, we expect to have a significantly improved product.*** Similarly, pressures on discretionary consumer spending, especially among Tinder's younger user base, have negatively impacted Tinder's a la carte revenue. The team is doubling down on its efforts to improve the efficacy of its current ALC features and introduce new offerings at affordable price points. We expect to see improvements in ALC trends by the back half of the year. We know we have work to do to satisfy every new generation of daters. The Tinder team is working to improve the dating journey at every point of the experience. ***Through innovation, especially with AI, we believe we can improve the quality of profiles, matching outcomes, safety features, and the post-match experience to make the entire Tinder platform more modern and deliver on their brand promise.***

I've asked our Chief Technology Officer and his central innovation team to work even more closely with Tinder's product team to expedite all these efforts which are underway. ***And given Tinder's vast scale and knowledge about relationships and dating, there is no dating app better positioned to take advantage of these advances in technology.*** Tinder has become an industry defining highly profitable business over the past decade. We have been innovating to solve some of the user pain points. As a result, we will have a healthier, more satisfying, and ultimately more valuable experience for daters to enjoy.

***And I am confident that Tinder's momentum will come back. We believe we have real market opportunity and the right teams and strategies in place to get to that next level of growth.*** And we are determined to deliver that for all of our stakeholders. We continue to see significant growth runway at Hinge and our emerging brands portfolio. ***We're executing on our turnaround plan for Tinder and our central innovation teams are bringing renewed vigor to product innovation***. We are excited to continue this work as giving people new,

exciting ways to connect is what motivates us every day. And with that, let me turn it over to Gary.

68.     On July 31, 2024, Match Group hosted an earnings call to discuss financial results for its second fiscal quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Swidler stated the following regarding Tinder's MAU:

Focusing on user trends, we saw sequential stability in Tinder's MAU, which were down 9% year-over-year in Q2, as was the case in Q1. MAU at Tinder have now been relatively stable since March. *A large decline in MAU began in July of last year, driven in large part by changes we made to Tinder's trust and safety policies to remove people who are not truly on the app to connect that has now begun to stabilize.*

With much of this impact now behind us and given Tinder's various ongoing product and marketing initiatives, *we're confident Tinder's year-over-year MAU declines should continue to moderate as this year passes.*

69.     Also during the 2Q24 Earnings Call, Defendant Kim represented that investors and the public could expect "better year-over-year MAU trends":

Over the last several quarters, Tinder has been working hard to improve the user experience, and we're now starting to see initial signs of progress. User and payer trends are stabilizing, and we expect them to continue to improve from here. *We expect strong sequential payer growth in Q3 and better year-over-year MAU trends in the second half of the year.*

As the largest dating app in the world, it's Tinder's job to deliver for its users, which in turn helps attract new users. *Tinder is building on its fun legacy and its iconic swipe experience by continuing to increase authenticity and realness and by setting the industry standard for trust and safety.* We believe this will address some of the concerns that

26
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

users have been vocal about more recently.

70.     During the 2Q24 Earnings Call, the following exchange occurred between Defendant Kim and a Morgan Stanley analyst:

> **Nathan Feather – Morgan Stanley, Analyst**
> Hey, everyone. ***Congrats on the stabilization and Tinder user growth in the quarter***. Is there anything outsized that led to that stabilization or more so stacking of a variety of individual improvements? And can you help us contextualize how much of that is due to new user trends versus retention? Thank you.
>
> **Defendant Kim**
> Thanks, Nathan, for that question. I really like how you framed it around stacking Tinder product improvements. Our work is really a combination of product initiatives building on each other over time. And this is reinforced with really strong marketing that is helping drive stabilization and start contributing to improvements on the back half of this year. The trust and safety moves that we made last year are one of -- is a great example of stacking initiatives, which we know were the right decisions. And the good news is we've worked through a lot of those -- a lot of that noise and has led to better user outcomes and say that the user base has stabilized, retention is improving and growing and we're making strides in top of funnel again. It's a really exciting time period for Tinder.

71.     On August 1, 2024, Match Group filed a quarterly report for its second fiscal quarter of 2024 (the "2Q24 10-Q") which incorporated by reference the risk disclosure identified above in the Company's 2023 10-K.

72.     The statements identified above were materially false and misleading, and omitted to state material adverse facts necessary to make the statements not misleading, because they failed to disclose that: (i) the Individual Defendants were understating the challenges facing the Company regarding generating user growth

for Tinder; (ii) accordingly, there was a substantial risk that Tinder's MAU would not recover by the time the Company revealed its third quarter 2024 financial results; (iii) Tinder was facing additional issues related to its average revenue per user; (iv) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

***The Truth Emerges***

73.    On November 6, 2024, the Company published a shareholder letter, which disclosed the following:

> Tinder MAU was down 9% Y/Y in Q3, which was the same rate of decline as in Q2, falling short of our expectations for continued improvement in Y/Y trends. From mid-September through October, we saw more pressure on new users (registrations and reactivations) than we expected, which has led to pressure on MAU.
>
> Tinder's primary focus remains driving its product transformation efforts forward to improve ecosystem health and user outcomes, which we believe are necessary for durable improvements in user, Payer, and revenue trends.

74.    On November 7, 2024, Investopedia issued a report titled "Match Group Stock Slips as Fourth Quarter Outlook Disappoints," which stated the following, in relevant part:

> Shares of online dating giant [Match] tumbled Thursday morning despite a third-quarter earnings beat released after the bell Wednesday.
>
> * * *
>
> Revenue and downloads of Hinge continued to grow, ***but Match said***

***Tinder Direct revenue came in below its own expectations, as the app's monthly active users (MAUs) declined 9% from the same time last year and its revenue per payer (RPP) grew less than expected. Some new features tested with Tinder users in the quarter negatively impacted subscription revenue, which the company said will likely also have an impact on fourth quarter revenue.***

75.    Also on November 7, 2024, Match Group hosted an earnings call to discuss financial results for its third fiscal quarter of 2024 (the "3Q24 Earnings Call"). During the 3Q24 Earnings Call, Defendant Kim revealed the following regarding user growth on Tinder:

As I mentioned during our last call, shareholders rightfully expect both short and long-term results. In the short-term, Tinder's direct revenue was slightly below our expectations driven by the under delivery of certain optimizations. However, Tinder added 311,000 payers sequentially and declined by only 4% year-over-year. This was well above our outlook provided in late July.

***While we're pleased with the results on payers, we saw less progress on Tinder MAU than we expected.*** Tinder remains focused on the long-term testing several important new features aimed at cleaning up its ecosystem and improving user outcomes. This includes testing mandated face photos in several markets.

\* \* \*

We're pleased with the progress we've seen recently at Tinder on product execution, but are far from done. The team is working tirelessly pushing forward with initiatives to drive Tinder's transformation forward. ***At the same time, we're clear eyed that Tinder's progress will not always be linear because we know that transformation, such as these, take time.***

76.    Also during the 3Q24 Earnings Call, Defendant Swidler stated the following:

Tinder MAU were down 9% in the quarter consistent with Q2 trends. *We had expected to see improvement in year-over-year MAU trends in the quarter. However, in mid-September, we began to see weaker new user trends, which includes new registrations and reactivations of lapsed users than is typical at this time of year,* a trend that has stabilized in October.

The pressure on new users was largely confined to iOS. We are working collaboratively with Apple to investigate whether it's related to the introduction of iOS 18 in mid-September, certain trust and safety enhancements we made or another cause. *This in turn has caused pressure on Tinder MAU.* We are working on a number of initiatives to improve this trend.

77.    During the 3Q24 Earnings Call, the following exchange occurred between Defendant Kim and an analyst from Barclays:

**Ross Sandler – Barclays – Analyst**
Great. So I guess, Gary, starting with the Tinder top of funnel trends, could you just elaborate a little bit more on what's going on? You mentioned iOS and a few other things around top of funnel and the weaker MAU at the end of 3Q and then what's happening right now in 4Q? And as we turn ahead to '25, other than cranking on marketing, what other trends might help drive top of funnel at Tinder? And I guess it's related to this, did you feel like Tinder's operating margin at 52% is at the right level or how do we think about that long-term? Thank you.

**Defendant Kim**
Thanks, Ross. This is BK. I'm going to handle the first part of that question and Gary can jump in on the margin side. So we did see a step back in Tinder's MAU growth starting in mid-September. And as Gary mentioned in his comments, we're investigating several possible causes. This includes the introduction of iOS 18 and some recent trust and safety enhancements that may have added to friction for daters. While I believe this step back isn't what we wanted, we don't see this as a long-term structural shift. Our team's top priority remains driving product innovation and that's where Tinder's focus is. We know we need to clean up the ecosystem and create better experiences, especially for

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

younger users and women and we're working on it, but meaningful changes do take time. Now you mentioned marketing and it's definitely key to reinforce Tinder's brand and promoting new products. But marketing alone will not drive top of funnel growth. That's why our focus is on product-led strategies to build sustainable engagement. We're excited for Investor Day, so we can lay out our product roadmap and discuss our plans to get Tinder back on track. We're confident in these plans.

78.     On this news, the price of Match Group stock declined 17.8% in one day, from a close of $37.88 per share on November 6, 2024 to a close of $31.11 on November 7, 2024.

**Stock Repurchases During the Relevant Period**

79.     According to the Company's public filings, while the price of Company stock was artificially inflated due to the false and misleading statements detailed herein, the Individual Defendants caused the Company to repurchase more than 30 million shares of its own stock, for a total of roughly $1.069 billion.

80.     Given that the price of Match Group stock was $31.11 after the corrective disclosures on November 7, 2024, the true value of the 30,027,247 shares purchased between May 2023 and October 2024 was roughly $934 million. Accordingly, the Individual Defendants caused the Company to overpay by approximately $135 million to repurchase these shares.

1

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

2      81.    Plaintiff brings this action derivatively in the right and for the benefit

3  of the Company to redress injuries suffered and to be suffered as a direct and

4

5  proximate result of the breach of fiduciary duties by the Individual Defendants.

6      82.    Match Group is named solely as a nominal party in this action.  This

7  is not a collusive action to confer jurisdiction on this Court that it would otherwise

8

9  not have.

10      83.    Plaintiff is a current shareholder of Match Group and was a continuous

11  shareholder of the Company during the period of the Individual Defendants'

12

13  wrongdoing alleged herein. Plaintiff will adequately and fairly represent the

14  interests of the Company in enforcing and prosecuting its rights and retained

15

16  counsel competent and experienced in derivative litigation.

17      84.    A pre-suit demand on the Board of Match Group is futile and,

18  therefore, excused. At the time this action was commenced, the eleven-member

19

20  Board was comprised of Defendants McInerney, Kim, Spoon, McDaniel,

21  Schiffman, Jones, Brenner, Seymon, Dubey, Rascoff, and Bailey (the "Director

22  Defendants"). Accordingly, Plaintiff is only required to show that six Directors

23

24  cannot exercise independent objective judgment about whether to bring this action

25  or whether to vigorously prosecute this action. As set forth below, all of the Board's

26  current members are incapable of making an independent and disinterested decision

27

28

to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

85.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

86.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

87.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

88.     Defendant Kim is not disinterested or independent. Defendant Kim serves as the Company's CEO. Accordingly, the Company acknowledges that Defendant Kim is a non-independent director.

89.     Further, Defendant Kim is not disinterested or independent, and therefore, is incapable of considering a demand because he is named as a defendant,

and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein.

90.    Defendants Spoon, Schiffman, and Bailey serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, public disclosures, internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

91.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to

make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

92.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Director Defendants have sought to enforce the Company's Compensation Recoupment Policy, which provides "for the recoupment of certain executive compensation in the event of an accounting restatement resulting from material noncompliance with financial reporting requirements under U.S. federal securities laws."

93.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot

be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

94.    The acts complained of herein constitute violations of fiduciary duties owed by Match Group's officers and directors, and these acts are incapable of ratification.

95.    The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Match Group. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Match Group, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is

futile and, therefore, excused.

96.    If there is no directors' and officers' liability insurance, then the directors will not cause Match Group to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

97.    Thus, for all of the reasons set forth above, all eleven of Match Group's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

**Against the individual Defendants for Violations of § 14(a)**
**of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)**

98.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.    The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

100.    The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning Tinder's user growth and the Company's risk management function and internal controls over financial

reporting.

101.   The 2024 Proxy was used to solicit shareholder votes in connection with the election of Defendants Murdoch, Rascoff, Schiffman, and Seymon to serve for another three-year term on the Company's Board.

102.   In addition, the 2024 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Kim and Swidler. While the shareholder vote was non-binding, the 2024 Proxy indicated that the "Board and Compensation and Human Resources Committee value the opinions of all of our stockholders and will consider the outcome of this vote when making future compensation decisions for our named executive officers."

103.   Describing the Company's executive compensation "philosophy and objectives," the 2024 Proxy indicated that executive compensation is performance based: "We take a rigorous performance-based approach to executive compensation."

104.   The materially false and misleading statements contained in the 2024 Proxy regarding Tinder's user growth and the Company's risk management function and internal controls over financial reporting therefore misleadingly induced shareholders to vote in favor of the election of Defendants Murdoch, Rascoff, Schiffman, and Seymon to serve for another three-year term on the Company's Board, and performance-based compensation to officers of Match

Group, including Defendants Kim and Swidler, to which they were not entitled.

105.   The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

**Against the Individual Defendants for Violations of § 10(b)**
**of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5**

106.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.   The Individual Defendants participated in a scheme with the purpose and effect of defrauding Match Group. Not only is Match Group now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Match Group by the Individual Defendants.

108.   During the Relevant Period, the Individual Defendants caused the Company to overpay by approximately $135 million to repurchase roughly 30 million shares.

109.   The Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

110.   The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Match Group not misleading.

111.   The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Match Group.

112.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

113. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT III

### Against the Individual Defendants
### For Breach of Fiduciary Duty

114. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

116. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

117. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

118.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

119.   Plaintiff, on behalf of Match Group, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

120.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.   In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

122.   Plaintiff on behalf of Match Group has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

123.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Match Group.

125.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Match Group that were tied to the performance or artificially inflated valuation of Match Group, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

126.   Plaintiff, as a shareholder and a representative of Match Group, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

127.   Plaintiff on behalf of Match Group has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Abuse of Control

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

130.    As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

131.    Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants for Waste of Corporate Assets

132.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

134.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal

liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

135.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

136.   Plaintiff on behalf Match Group has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.   Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.   Awarding punitive damages;

D.   Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.　　Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: December 13, 2024　　Respectfully submitted,

**TOSTRUD LAW GROUP, P.C.**
Jon A. Tostrud (CA. Bar No. 199502)

/s/ *Jon A. Tostrud*
　　Jon A. Tostrud

1925 Century Park East, Ste. 2100
Los Angeles, CA. 90067
Telephone: (310) 278-2600
Facsimile: (310) 278-2640
jtostrud@tostrudlaw.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Ste. 300
Garden City, NY 11530
Telephone: (516) 683-3516
sdr@rl-legal.com
tjm@rl-legal.com
sa@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Ste. 3600
Philadelphia, PA 19103
Telephone: 267-507-6085
jgrabar@grabarlaw.com

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT